Jeffrey H. Ochrach [SBN 131027]
OCHRACH LAW GROUP
Rocklin Professional Building
5701 Lonetree Blvd., Ste. 213
Rocklin, California 95765
Telephone:   916-626-6880
Facsimile:   916-626-3331
JeffOchrach@ochrach.com

Attorney for PERFORMANCE CHEVROLET, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| PERFORMANCE CHEVROLET, INC. | ) | CASE NO. |
|---|---|---|
| Plaintiff, | ) ) ) | COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF |
| vs. | ) ) | |
| ADP DEALER SERVICES, INC., | ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

## I.

## JURISDICTIONAL STATEMENT

1.  Plaintiff PERFORMANCE CHEVROLET, INC. ("Performance") is a corporation incorporated in California with its principal place of business in Sacramento, California. Defendant ADP DEALER SERVICES, INC. ("ADP") is a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of Illinois. The amount in controversy exceeds $75,000, exclusive of interest and costs. *Hunt v. Washington State Apple Advertising Comm'n.* (1977) 432 US 333, 347, 97 S.Ct. 2434, 2443 ("In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.") This Court, therefore, has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

2.  Moreover, Defendant ADP entered into the Master Services Agreement (the

1  "Master contract" or the "subject contract") in Sacramento, California and Defendant supplied
2  the services and products under the Master contract in Sacramento, California.

## II.

## VENUE

3.  The Ninth Circuit interprets 28 U.S.C. § 1400(a) to allow venue "in any judicial district in which the defendant would be amenable to personal jurisdiction if the district were a separate state." *Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir.1997), overruled on other grounds by *Feltner v. Columbia Pictures Television*, 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998)*; Brayton Purcell LLP v. Recordon & Recordon*, 361 F. Supp.2d 1135, 1138 (N.D. Cal. 2005) aff'd, 575 F.3d 981 (9th Cir. 2009) withdrawn and superseded on denial of reh'g en banc, 606 F.3d 1124 (9th Cir. 2010) and aff'd, 606 F.3d 1124 (9th Cir. 2010).

4.  Defendant entered into the subject contract in Sacramento, California and Defendant supplied the services and products under the subject contract in Sacramento, California. Therefore, venue is proper. *Atlantic Marine Const. Co., Inc. v. United States Dist. Ct. for Western Dist. of Texas* (2013) 134 S.Ct. 568, 576–577

## III.

## PARTIES

5.  Plaintiff Performance is a corporation incorporated in California with its principal place of business in Sacramento, California. Performance is a Chevrolet dealership.

6.  Defendant ADP is a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of Illinois. ADP sells and services auto dealership computer systems.

## IV.

## GENERAL ALLEGATIONS

8.  Performance realleges and incorporates herein by reference the allegations of Paragraphs 1 through 7.

9.  Performance is a Chevrolet car dealership. For many years, Performance

contracted with Universal Computer Systems (later known as Reynolds and Reynolds Company) to use a specialized computer system designed specifically for car dealerships, called a Dealership Management System ("DMS"). The system was used in all aspects of operating the car dealership – sales, parts, service and accounting – and had become integral in effective operation of the business.

10. In late 2013, ADP conducted meetings with Performance to persuade Performance to contract with ADP to replace its DMS. Defendant explained that its computer system was better; all of Performance's existing data would be quickly and seamlessly converted to ADP's system; and the cost would be far less than Reynolds was charging. Defendant convinced Performance.

11. In October 2013, Performance executed ADP's Master Services Agreement. Under the Agreement, ADP agreed to supply Performance with a new DMS system, to convert all historical data from Performance's existing DMS to ADP's new system, and to provide a fully functioning, good working-order DMS to Performance.

12. ADP began working on converting Performance's DMS over to the ADP system, with its assurance that the new ADP system would be fully operating in February 2014. ADP began training Performance personnel in December 2013; installed its hardware in January 2014; and sent a full team of trainers to Performance's dealership for two weeks of February 2014 to train all departments (sales, parts, service and accounting) how to use the new DMS system.

13. As soon as ADP's system was turned on, it did not function properly. For example, ADP's DMS contained only a limited history of Performance's prior sales, service records, parts and accounting transactions; it did not accurately balance cash sales to the previous day; payroll reports were incorrect; parts inventory reports were inaccurate. Because ADP's system was a complete failure, Performance managers and staff had to manually do things the system was supposed to handle, and they could not rely on information provided by the ADP system. This caused Performance employees to have to work many extra hours, nights and weekends to do their work, frustrating many employees and, in fact, causing Plaintiff's payroll specialist to quit.

*COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF*
Page 3

14. Performance immediately and repeatedly told ADP about the problems. ADP sent many representatives out to Performance to work on fixing the problems. Many times the representatives hadn't been prepared by ADP to know what was wrong or what they should do to fix the problems. Performance managers would have to stop their work and explain – and re-explain – the problems over and over. Joanne Sullivan, the ADP Director of Implementation, was typically the person who assigned ADP people to go to Performance to fix problems. In early May 2013, Ms. Sullivan visited Performance's dealership and met with its managers to discuss the problems. She took pages of notes about the system's problems, and she promised to have the problems fixed. Ms. Sullivan emailed to Performance plans for fixing the problems. None of these plans worked. ADP sent more people to Performance on June 2, 2014; they left after one day. More ADP people came later in June; but they could not fix the problems. John Crawford of ADP told John McMichael, president of Performance, that the reason the ADP system was so woeful was that ADP's expert at converting data from Performance's UCS system to ADP's system was on vacation at the time the work was done and ADP did not have anyone else who was capable of doing the job. In July 2014, Scott Herbers, ADP Vice President, and Greg Korte, the ADP sales manager who negotiated the subject contract with Performance, met with Mr. McMichael and said that they would fix all of the problems or amicably terminate the contract.

15. By September 29, 2014, ADP had still not fixed the problems. ADP's system was still inoperable and malfunctioning. Performance was having – and had been having since February 2014 – difficulty running its business properly because of the malfunctioning ADP system. Almost an entire year had passed since the parties agreed to the subject contract, and ADP still had not been able to provide a properly functioning DMS system. On September 29, 2014, Performance sent a registered letter to ADP's Mr. Herbers terminating effective December 1, 2014 the subject contract for cause – ADP's failure to deliver a functioning product.

16. Thereafter, Performance contracted with Reynolds to return to the original DMS system Performance used before converting to ADP's system.

///

**FIRST CAUSE OF ACTION**

**(BREACH OF CONTRACT)**

17. Performance realleges and incorporates herein by reference the allegations of Paragraphs 1 through 16.

18. Plaintiff has performed all of the conditions of the subject contract that are required to be performed by plaintiff.

19. Defendant has breached the subject contract by failure to perform; i.e., by failing to deliver products that performed their intended functions and were in good working order, or that conformed to their functional and technical specifications. Performance spent eight months or more working with ADP to try to convince ADP to fix the problems and provide a functioning computer system; ADP tried but was incapable of delivering.

20. As a direct and proximate result of the aforementioned conduct of defendant, Plaintiff has been damaged in the sum in excess of $75,000 according to proof at trial.

WHEREFORE, Plaintiff prays judgment as set forth below.

**SECOND CAUSE OF ACTION**

**(DECLARATORY RELIEF)**

21. Performance realleges and incorporates herein by reference the allegations of Paragraphs 1 through 20.

22. An actual controversy has arisen and now exists between plaintiff and defendant regarding their respective rights and duties under the subject contract. Plaintiff contends that defendant committed a total and complete breach of the subject contract by failing, after more than six months following installation of their equipment, to provide a system that functions properly, resulting in a termination of the subject contract. Defendant disputes this contention, arguing that it did not breach the subject contract.

23. Plaintiff desires a judicial determination of its rights and duties, and a declaration as to whether plaintiff was entitled to terminate the subject contract as a result of the matters alleged in this complaint.

24. A judicial declaration is necessary and appropriate at this time under all the

circumstances so that plaintiff may ascertain its rights and duties with respect to the subject contract.

WHEREFORE, plaintiff requests judgment against defendant as follows:

1. For a declaration that Defendant materially and totally breached the subject contract and/or entitled Plaintiff to terminate the subject contract;
2. For compensatory damages in excess of $75,000 according to proof;
3. For recovery of attorneys' fees and costs per the Master Services Agreement;
4. For costs of suit incurred herein; and
5. For such other and further relief as the court deems proper.

Dated: November 21, 2014  OCHRACH LAW GROUP

      /w/ Jeffrey H. Ochrach
Jeffrey H. Ochrach
Attorney for Plaintiff, Performance Chevrolet, Inc.